program, "a separate violation occurs for each day the violation continues and at each office, branch, or place of business at which a violation occurs or continues." *See id.*

27.    The willfulness requirement of 31 U.S.C. § 5321(a)(1) may be satisfied by showing that the defendant acted recklessly or with willful blindness. *See United States v. Williams*, 489 Fed. Appx. 655, 658, 660 (4th Cir. 2012); *United States v. McBride*, 908 F. Supp. 2d 1186, 1204-05 (D. Utah 2012); *see generally Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57-58 (2007) ("where willfulness is a statutory condition of civil liability, we have generally taken it to cover not only knowing violations of a standard, but reckless ones as well").

28.    FinCEN has six years from the date of the relevant underlying conduct to assess a civil money penalty under 31 U.S.C. § 5321(a)(1). *See* 31 U.S.C. § 5321(b)(1).  FinCEN may commence a civil action to recover an assessed penalty "at any time before the end of the 2-year period beginning on . . . the date the penalty was assessed." *Id.* § 5321(b)(2).

29.    In addition to seeking a civil money penalty, when FinCEN "believes a person has violated, is violating, or will violate [the BSA or its implementing regulations]," it "may bring a civil action . . . to enjoin the violation or to enforce compliance with the [BSA or its implementing regulations]." *Id.* § 5320.

**B.     MoneyGram's Money Transfer Business**

30.    At all times relevant to this complaint, MoneyGram operated a money transfer service that enabled customers to transfer money to and from various locations in the United States and abroad through MoneyGram's global network of agents and outlets.

31.    MoneyGram outlets were independently-owned entities that MoneyGram authorized to transfer money through its money transfer system.  Typically, MoneyGram outlets

were businesses (such as convenience stores and internet cafes) that offered money transfers

through MoneyGram, but primarily provided other types of goods and services.

32.    MoneyGram agents were individuals or entities that owned and/or operated

MoneyGram outlets.

33.    MoneyGram had the right to terminate its agents/outlets for a variety of reasons,

including suspected involvement in fraud or money laundering.

34.    To send money using MoneyGram's money transfer system, customers went to a

MoneyGram outlet and completed a "send" form, on which they identified the name of the

recipient and the state or province and country where the money was to be sent.  The

MoneyGram agent then collected the money to be transferred plus a fee from the customer and

entered the information from the send form into a transaction database maintained by

MoneyGram.

35.    To receive a MoneyGram money transfer, the payee was required to physically

appear at a MoneyGram outlet and complete a "receive" form.  On the receive form, the payee

listed, among other things, his or her name and the expected transfer amount.  The MoneyGram

agent at the receive location then queried MoneyGram's transaction database to find the money

transfer intended for the payee.  Upon locating the money transfer, the agent paid the payee.  The

payee was paid either in cash or in the form of a MoneyGram transfer check or money order.

36.    MoneyGram profited from its money transfer business by collecting a fee from

each send transaction processed by one of its agents/outlets.  Accordingly, to maximize profits,

MoneyGram had an incentive to expand the number of its agents/outlets, and it had a

disincentive to terminate agents/outlets.

37.     MoneyGram maintained thousands of agents and outlets throughout the United States, including many in New York State.

38.     Within New York State, MoneyGram maintained hundreds of agents and outlets that sent and/or received fraud-induced money transfers.  For example, in 2007, more than 250 different MoneyGram outlets in New York State sent approximately 475 money transfers that were reported to MoneyGram as having been induced by fraud, totaling more than $900,000 in consumer losses.  Similarly, in 2007, more than 80 different MoneyGram outlets in New York State received approximately 500 money transfers that were reported to MoneyGram as having been induced by fraud, totaling more than $900,000 in consumer losses.

39.     Moreover, many of the MoneyGram outlets in New York State that sent and received fraud-induced money transfers were located within the Southern District of New York. For example, in 2007, more than 40 different MoneyGram outlets located in Manhattan and the Bronx sent or received money transfers that were reported to MoneyGram as having been induced by fraud.  In 2007, such outlets sent approximately 70 such money transfers and received approximately 65 such transfers.

C.     **MoneyGram's Internal Organizational Structure**

40.     At all times relevant to this complaint, MoneyGram was organized by department, with different departments having responsibilities for different functions.  The departments included (1) Fraud, (2) AML Compliance, (3) Risk, and (4) Sales.

41.     The Fraud Department was responsible for, among other things, identifying existing agents/outlets that might be engaging in fraud against MoneyGram or its customers, and investigating such agents/outlets to determine whether action should be taken against them.

42.     The AML Compliance Department was responsible for, among other things, the day-to-day operations of MoneyGram's AML program, including (1) evaluating prospective agents/outlets, (2) auditing existing agents/outlets, and (3) formulating policies to ensure that SARs were filed in accordance with the BSA and its implementing regulations.

43.     The Risk Department was responsible for, among other things, identifying existing agents/outlets that posed a heightened risk to the Company, and investigating such agents/outlets to determine whether action should be taken against them.

44.     The Sales Department was responsible for, among other things, developing relationships with potential agents/outlets, and maintaining MoneyGram's relationships with existing agents/outlets.

45.     MoneyGram also had a call center that, among other things, fielded complaints from MoneyGram customers from around the world who called to report that they had been the victims of fraud (*i.e.*, they had been induced by fraud to send money transfers using MoneyGram's money transfer system). These complaints were memorialized in Consumer Fraud Reports. Each Consumer Fraud Report included, among other things, the identity of the defrauded consumer, the name of the MoneyGram outlet that had sent the fraudulent money transfer, and the name of the MoneyGram outlet that had received the fraudulent money transfer. The call center forwarded the Consumer Fraud Reports to MoneyGram's Fraud Department for investigation. When this complaint refers to the number of Consumer Fraud Reports accumulated by a particular outlet during a specified time period, it is referring to the number of Consumer Fraud Reports received by MoneyGram during that time period identifying the outlet as the receiving outlet for a fraud-induced money transfer.

### D.   Haider's Role Within MoneyGram

46.     As set forth above, at all times relevant to this complaint, Haider was MoneyGram's Chief Compliance Officer and supervised the AML Compliance Department. Haider also supervised MoneyGram's Fraud Department.  MoneyGram's "Senior Director of AML Compliance," "Director of AML Compliance and Fraud," and "Director of Fraud" all worked under, and had direct contact with, Haider.

47.     As MoneyGram's Chief Compliance Officer, Haider was responsible for ensuring that MoneyGram complied with its obligations under the BSA and its implementing regulations, including that it (1) implemented and maintained an effective AML program, and (2) complied with its SAR-reporting obligations.

48.     Haider was the architect of MoneyGram's AML program, and was also responsible for assuring the Company's day-to-day compliance with it and for approving AML-related policy changes as appropriate.  In addition, Haider was responsible for ensuring that MoneyGram's AML program complied with the requirements of the BSA and its implementing regulations.

49.     As MoneyGram's Chief Compliance Officer, Haider had the authority to terminate or otherwise discipline MoneyGram agents and outlets because of compliance concerns.  Haider also had the authority to decline to approve new agents/outlets.

50.     Notably, after leaving MoneyGram in 2008, Haider stated that he did not recall anyone exerting any undue pressure on him not to terminate an agent that he wanted to terminate.

51.     Beginning in 2006, and continuing throughout the remainder of his employment at MoneyGram, Haider was a member of MoneyGram's Senior Leadership Team, an executive

management group whose members reported directly to MoneyGram's Chief Executive Officer ("CEO").

52.    Although Haider did not report directly to MoneyGram's Board of Directors (the "Board"), he made presentations quarterly to the Audit Committee of the Board to keep the Board apprised of developments in the AML program.  In addition, there was an open line of communication between Haider and the Audit Committee, and Haider's reports to the Audit Committee were not screened by MoneyGram's other senior managers.

53.    Haider received an annual salary from MoneyGram, as well as an annual bonus that was based, in whole or part, on the performance of the Company.

**E.    Fraudulent Use of MoneyGram's Money Transfer Business**

54.    From as early as 2003, and continuing throughout Haider's employment at MoneyGram, certain MoneyGram agents and outlets located in the United States and Canada participated in schemes to defraud the public, using MoneyGram's money transfer system to facilitate the schemes.

55.    The fraudulent schemes relied on a variety of false promises and other representations aimed at misleading the public and inducing unsuspecting victims to send money through MoneyGram's money transfer system, using the participating MoneyGram agents and outlets.  The participating MoneyGram agents and outlets, together with other co-conspirators (collectively, the "perpetrators"), solicited victims through the mail, internet, and telephone, telling the victims, among other things, that they had won a lottery, had been hired for a "secret shoppers" program through which they would be paid to evaluate retail stores, had been approved for a guaranteed loan, or had been selected to receive an expensive item or cash prize. The victims were told that to receive the item or benefit, they had to pay the perpetrators some

amount of money in advance. For example, in situations where the victims were promised

lottery winnings or cash prizes, they were told that they had to pay taxes, customs' duties, or

processing fees up front. The victims were directed to send the advance payments to fictitious

payees using MoneyGram's money transfer system.

56.     After such payments had been sent, the agents participating in the fraud on the

receiving end would remove the victims' money from MoneyGram's money transfer system and

the money would ultimately be divided among the perpetrators. In some instances, the

participating agents on the receiving end would further transfer the victims' money to additional

participants in the scheme before the money was divided among the perpetrators. In other

instances, participating agents would identify fraudulent money transfers in MoneyGram's

money transfer system and then instruct other participating agents to remove the victims' money

from the money transfer system. These additional steps were designed to conceal the ultimate

destination of the fraud proceeds by "laundering" the victims' money.

57.     Some of the MoneyGram agents involved in the above-referenced fraudulent

schemes have since been charged criminally and convicted, and are now serving prison terms.

58.     It was understood within MoneyGram's Fraud and AML Compliance

Departments that New York State was one of the locations where problem agents/outlets were

located. For example, in late 2007 or early 2008, MoneyGram's then Director of Fraud

identified New York State as one of four states in the United States whose agents/outlets had

received the most fraud-induced money transfers in 2007. The Director of Fraud observed that,

in 2007, agents/outlets in New York State received 10% of all fraud-induced money transfers

sent using MoneyGram's money transfer system within the United States. The Director of Fraud

further observed that those fraud-induced money transfers had resulted in losses to consumers of

17

more than $900,000.  The Director of Fraud also identified specific high-risk outlets in New

York, including two that had accumulated at least 40 Consumer Fraud Reports in 2007, resulting

in combined losses to consumers of more than $150,000.

59.     It was also understood within MoneyGram's Fraud and AML Compliance

Departments that:  (1) New York was a high-risk geographic area; (2) MoneyGram's New York

Chinatown agents were a particular area of concern; and (3) New York to China was a high-risk

corridor for money transfers.

60.     Moreover, Haider was on notice of compliance issues relating to specific New

York agents/outlets.  For example, in October 2007, Haider was informed that the U.S. Drug

Enforcement Administration had seized funds belonging to MoneyGram from an outlet located

in Brooklyn, New York, in connection with a money laundering investigation.  Shortly thereafter

(and also in October 2007), MoneyGram's then Director of AML Compliance and Fraud sent

Haider an email identifying a number of red flags associated with the outlet.  Specifically, the

Director informed Haider that:  (1) up to that point in 2007, MoneyGram had filed SARs on

specific money transfers (*i.e.*, transactions) processed by this outlet that totaled almost $2

million; and (2) those SARs typically described such things as "two [customers] working

together to send funds to the same receiver at the same time"; "multiple [customers] using the

same ID or one [customer] using different IDs on the same date, at the same time"; and

customers "structuring" their money transfers to avoid reporting thresholds "by sending multiple

transactions."  In other words, the email indicated that the SARs described activities that should

have been obvious to the outlet's agent/owner.  Nevertheless, as of October 2007, MoneyGram

had not filed a SAR identifying this outlet or its agent/owner as the subject.

18

F.    **MoneyGram's Prior Resolutions with the Federal Trade Commission and the Department of Justice**

61.    On October 19, 2009, the Federal Trade Commission ("FTC") filed a complaint against MoneyGram, alleging that from 2004 through 2008, MoneyGram agents in the United States and Canada aided fraudulent telemarketers and other perpetrators of telephone and internet scams who misled U.S. consumers into wiring tens of millions of dollars to participants in the fraud. In October 2009, MoneyGram settled the FTC's consumer fraud claims by agreeing to pay an assessed penalty of $18 million.

62.    On November 9, 2012, MoneyGram entered into a Deferred Prosecution Agreement ("DPA") with the Department of Justice's Asset Forfeiture and Money Laundering Section and the U.S. Attorney's Office for the Middle District of Pennsylvania ("MDPA") on charges of aiding and abetting wire fraud, in violation of 18 U.S.C. §§ 1343 and 2, and willfully failing to implement an effective AML program, in violation of 31 U.S.C. § 5318(h). MoneyGram agreed to forfeit $100 million as part of the DPA and to retain an independent compliance monitor approved by the Department of Justice.

63.    As part of the DPA, MoneyGram admitted, among other things, that it had "willfully failed to maintain an effective [AML] program that was reasonably designed to prevent it from being used to facilitate money laundering." *United States v. MoneyGram Int'l, Inc.*, 12-cr-291 (M.D. Pa. 2012), Docket 3-1, at ¶ 31. The specific programmatic failures to which MoneyGram admitted included:

- "MoneyGram failed to implement policies or procedures governing the termination of Agents involved in fraud and money laundering."

- "MoneyGram failed to implement policies or procedures to file the required SARs when victims reported fraud to MoneyGram on transactions over $2,000. Instead, MoneyGram structured its AML program so that individuals responsible for

filing SARs did not have access to the Fraud Department's Consumer Fraud Report database."

- "MoneyGram filed [SARs], in which [it] incorrectly listed the victim of the fraud as the individual who was the likely wrongdoer.  MoneyGram failed to file SARs on their Agents who MoneyGram knew were involved in the fraud."

- "MoneyGram failed to conduct effective AML audits of its Agents and Outlets.  MoneyGram's Senior Director of Anti-Money Laundering refused to conduct audits on certain Outlets involved in fraud and money laundering that MoneyGram refused to terminate because the Outlets were 'criminal operations' and sending their audit team into those Outlets would put the audit team in 'physical danger.'"

- "MoneyGram failed to implement policies or procedures to review MoneyGram transfer checks of Agents known or suspected to be involved in 'check pooling,'" a type of money-laundering scheme.

- "MoneyGram failed to conduct adequate due diligence on prospective MoneyGram Agents.  MoneyGram routinely signed up new Agents without visiting the locations or verifying that a legitimate business existed.  As a result, some of the Agents involved in fraud and money laundering operated out of homes in residential neighborhoods and other locations that were not open to the public."

- "MoneyGram failed to conduct adequate due diligence on MoneyGram Agents seeking additional MoneyGram Outlets.  MoneyGram routinely granted additional Outlets to Agents known to be involved in fraud and money laundering."

*Id.*  The above programmatic failures all existed while Haider was MoneyGram's Chief Compliance Officer, and resulted in MoneyGram violating the BSA.

**G.    FinCEN's Assessment Against Haider**

64.    On December 18, 2014, FinCEN assessed a civil money penalty against Haider in the amount of $1 million, based on his willful failure to ensure that MoneyGram (1) implemented and maintained an effective AML program, and (2) filed timely SARs.

65.    In November 2013, FinCEN and Haider entered into a tolling agreement, pursuant to which the parties agreed that any statute of limitations applicable to the claims at issue here would be tolled from and including November 15, 2013, through and including August 30, 2014. That tolling period was subsequently extended through and including December 19, 2014.

20