Accordingly, FinCEN was entitled to base its assessment against Haider on conduct occurring from and including November 15, 2007, through and including the date of Haider's separation from MoneyGram — on or about May 23, 2008 (the "Assessment Period"). *See* 31 U.S.C. § 5321(b).

66. Haider's willful failure to ensure that MoneyGram implemented and maintained an effective AML program during the Assessment Period rendered him subject to a penalty of $25,000 per day. *See id.* § 5321(a). Similarly, Haider's willful failure to ensure that MoneyGram fulfilled its obligation to file timely SARs during the Assessment Period rendered him subject to a penalty of at least $25,000 per violation. *See id.*

67. The Assessment Period is approximately 190 days. Accordingly, the $1 million penalty that FinCEN assessed against Haider is substantially less than the amount it could have assessed against him. Indeed, for the AML program violations alone, Haider's exposure was at least $4.75 million (190 days * $25,000 per day = $4,750,000).

## II. HAIDER WILLFULLY FAILED TO ENSURE THAT MONEYGRAM IMPLEMENTED AND MAINTAINED AN EFFECTIVE AML PROGRAM

### A. Haider Failed to Implement a Policy for Disciplining Agents/Outlets, or to Terminate Agents/Outlets that He Knew or Should Have Known Posed an Unreasonable Risk of Fraud and Money Laundering

#### 1. Haider Failed to Implement a Policy for Disciplining Agents/Outlets

68. Throughout Haider's tenure as MoneyGram's Chief Compliance Officer, he failed to implement a policy for terminating or otherwise disciplining agents/outlets that presented a high risk of fraud and money laundering.

69. Moreover, while Haider was in charge of MoneyGram's compliance program, MoneyGram rejected or ignored at least two written discipline policies — proposed by the Fraud Department — that would have required that outlets be terminated or otherwise disciplined if,

within a defined period, they accumulated a certain number of Consumer Fraud Reports or reached a certain dollar amount of consumer fraud payouts. For example, in 2006, the Fraud Department proposed a policy to terminate or otherwise discipline "suspect Canadian locations." Under this policy, an outlet would have been terminated if it accumulated 15 Consumer Fraud Reports or $22,500 in fraud payouts within three months, 20 Consumer Fraud Reports or $30,000 in fraud payouts within six months, or 25-30 Consumer Fraud Reports or $37,500-$45,000 in fraud payouts within one year. The proposed policy provided for lesser discipline (*i.e.*, a warning letter or phone call) if an outlet met lesser benchmarks during the defined periods.

70. In March 2007, the Fraud Department proposed a similar policy that would have been applicable to all outlets, not just those located in Canada.

71. At a minimum, the March 2007 policy was presented to Haider. Yet Haider not only failed to implement it, but also failed to implement any policy for terminating or otherwise disciplining high-risk agents/outlets during his employment at MoneyGram.

72. Haider's failure to ensure that a discipline policy was implemented was particularly egregious given that: (1) in an April 17, 2007 letter, MoneyGram's outside counsel told the FTC that, "[d]ue to MoneyGram's concern about [certain Canadian outlets], MoneyGram . . . plans to institute a new policy to review fraud activity at the individual agent level on a quarterly basis, looking specifically at the number of reported fraud transactions and dollar value of those transactions in particular time frames. The policy will also include criteria for the trigger points for sending warning letters to agents, agent suspensions, and agent terminations"; (2) in or about 2007, MoneyGram provided its external AML consultant with a proposed set of guidelines to govern the termination of agents; and, as set forth below in Part

II.A.2, (3) Haider was on notice that numerous MoneyGram agents/outlets presented a high risk of fraud and money laundering.

73. Additionally, in mid-August 2007, MoneyGram's then Director of Fraud created a powerpoint presentation, titled "High Fraud Agents," in which, among other things, he: (1) observed that MoneyGram "does not have a consistent repeatable process to restrict agents that receive a disproportionate amount of fraudulent wire transfers (high fraud agents)"; (2) stated that "[w]e need to implement an on-going plan to address High Fraud Agents"; and (3) expressly "[r]ecommend[ed] implementing [a] Fraud Agent Closure Policy." The presentation concluded by identifying several "next steps," including "[r]eview [r]ecommendations w/Tom H. (8/21)" and "[i]mplement [p]olicy 9/17/07." Nevertheless, no discipline policy was implemented by MoneyGram prior to Haider leaving the Company.

74. Haider had the authority to implement a discipline policy. Therefore, to the extent the Sales Department or others successfully resisted implementation of such a policy, Haider allowed it to happen.

75. Haider's failure to implement a discipline policy allowed numerous agents/outlets that MoneyGram personnel knew or suspected were defrauding consumers, and that therefore presented an unreasonable risk of money laundering, to continue using MoneyGram's money transfer system to facilitate their fraudulent schemes.

    **2. Haider Failed to Terminate Agents/Outlets that He Knew or Should Have Known Posed an Unreasonable Risk of Fraud and Money Laundering**

76. From approximately January 2004 through May 2008, MoneyGram customers filed with MoneyGram more than 30,000 Consumer Fraud Reports involving MoneyGram agents/outlets in the United States and Canada, totaling approximately $60 million in consumer

losses. Many of these customers were residents of the United States who reported being defrauded into sending money transfers that were received by MoneyGram agents/outlets in Canada. Indeed, most Consumer Fraud Reports involved money transfers that were sent from the United States and received either in Canada or the United States. Notably, the actual number of defrauded consumers and loss amount was higher than the figures presented above because, as MoneyGram personnel recognized, not all victims of fraud reported the fraud to MoneyGram.

77. Beginning as early as 2003, and continuing throughout Haider's employment at MoneyGram, MoneyGram's Fraud Department compiled data from the Consumer Fraud Reports in an electronic fraud database (the "Consumer Fraud Report database"). That database was used to create reports identifying, among other things, the number of fraud complaints received in connection with specific MoneyGram outlets during specified time periods.

      a.    **Haider Received Data From the Consumer Fraud Report Database Identifying High-Risk Agents/Outlets, and Failed to Terminate Them**

78. Haider knew of the Consumer Fraud Report database, and received information and reports from it. For example, in March 2007, Haider received spreadsheets identifying specific outlets that had accumulated an alarmingly high number of Consumer Fraud Reports. One such spreadsheet, which Haider received on or about March 15, 2007, was titled "2006: Locations in Canada that Have Received Fraud Induced Money Transfers — Percentages of Fraud Induced Transfers." That spreadsheet, which listed all of the Canadian outlets that had received at least one fraud-induced money transfer in 2006, revealed that the top 10 outlets in terms of losses to consumers had received between 62 and 241 fraud-induced money transfers in 2006 alone, resulting in losses to consumers of between $171,946.00 and $419,838.30. For those 10 outlets, an exceedingly high percentage of their total number of received money transfers in

24

2006 were reported as fraudulent: between 8.7% and 16.2%. Moreover, eight of the 10 outlets appeared on another spreadsheet that Haider received on or about March 15, 2007, which contained analogous data for 2005. For those eight outlets, a high percentage of their total number of received money transfers in 2005 were also reported as fraudulent: between 7.8% and 25.3%. Of the above-referenced 10 outlets, only one was terminated by MoneyGram during Haider's employment at the Company. The remaining nine outlets were terminated within one year of Haider leaving MoneyGram.[2] Most or all of the above outlets had the vast majority of their received money transfers originate from consumers located in the United States.

### b. Haider Received Recommendations to Terminate Specific Agents/Outlets Supported By Data from the Consumer Fraud Report Database, and Failed to Terminate Them

79. Haider also received periodic recommendations from the Fraud Department to terminate specific agents and outlets for fraud. Those recommendations were supported by data from the Consumer Fraud Report database, and primarily involved fraudulent money transfers that originated from U.S. customers.

### i. The April 2007 Spreadsheets

80. In late March or early April 2007 — after MoneyGram had received a subpoena from the FTC in January 2007 seeking data regarding its Canadian outlets, including the percentage of their received money transfers that were reported as fraudulent — MoneyGram's then Director of AML Compliance and Fraud compiled a list of approximately 30 outlets in Canada that the Fraud Department was recommending be terminated for fraud. MoneyGram's then Senior Director of AML Compliance has since described those outlets as "the worst of the

---

[2] One of those nine outlets, while still affiliated with MoneyGram at the time Haider left the Company, appears to have stopped sending or receiving money transfers as of August 18, 2007 (*i.e.*, prior to Haider leaving MoneyGram, but no less than five months after Haider was put on notice of the outlet's high-risk status).

25

worst," with levels of fraud complaints that were "egregious and beyond anyone's ability to doubt that the agent had knowledge and involvement."

81. Thereafter, on April 20, 2007, the Director of AML Compliance and Fraud emailed Haider and other senior managers two spreadsheets (the "April 2007 Spreadsheets") listing 49 Canadian outlets that the Fraud Department was proposing for termination. The April 2007 Spreadsheets included approximately 30 outlets that the Fraud Department had previously recommended for termination, plus additional outlets that it was also recommending be terminated or at least sent warning letters and then very closely monitored. The April 2007 Spreadsheets contained information indicating that the 49 outlets were either engaging in or turning a blind eye to fraud, including data from the Consumer Fraud Report database showing that most of the outlets: (1) had an excessively high number of received money transfers reported as fraudulent; (2) had an excessively high percentage of their total number of received money transfers reported as fraudulent; (3) had an excessively high percentage of their received money transfers originate from the United States; and/or (4) received more money transfers than they sent.

82. Officials within the Fraud and AML Compliance Departments viewed the above characteristics as indicators of fraud. MoneyGram outlets in developed countries like the United States and Canada typically send (1) money transfers to less-developed countries, and (2) more money transfers than they receive. Therefore, it was unusual to see outlets in Canada receiving (1) significant numbers of money transfers from the United States, or (2) more money transfers than they sent. Moreover, most MoneyGram outlets did not accumulate any Consumer Fraud Reports. Therefore, it was unusual for an outlet to have more than a few (or more than 1 or 2%) of its received transactions reported as fraudulent.

83. In addition to the information described above, the April 2007 Spreadsheets conveyed the following specific information about the 49 outlets:

- During the six-month period from September 2006 through February 2007 (the "six-month period"), the 49 outlets accounted for approximately 58% of all reported fraud involving money sent through MoneyGram's money transfer system to Canada.

- Twenty-three of the 49 outlets had accumulated at least 25 and as many as 106 Consumer Fraud Reports during the six-month period (the "highest fraud outlets"). In other words, during the six-month period, the 23 highest fraud outlets had received between 25 and 106 fraud-induced money transfers.

- For those 23 highest fraud outlets, the fraudulent money transfers represented between 4.5% and 20.4% of their total number of received money transfers during the six-month period. Moreover, 21 of those 23 outlets had between 6.5% and 20.4% of their total number of received money transfers reported as fraudulent during the six-month period. Most of the other 49 outlets also had a high percentage of their total number of received money transfers reported as fraudulent during the six-month period; 23 had between 4.3% and 28.5%, while 19 had between 6.5% and 28.5%.

- During the six-month period, the 23 highest fraud outlets received between 75.9% and 100% of their total number of received money transfers from the United States. Seventeen of those outlets received more than 90% of their total number of received money transfers from the United States. Most of the other 49 outlets also received an exceedingly high percentage of their received money transfers from the United States, with 22 receiving 75% or more, 18 receiving 85% or more, and 13 receiving 90% or more.

- Many of the 49 outlets also received significantly more money transfers than they sent. For example, during the six-month period, 10 of those outlets had the following receive/send ratios: (1) 917 received/322 sent; (2) 267 received/24 sent; (3) 394 received/66 sent; (4) 426 received/153 sent; (5) 164 received/25 sent; (6) 522 received/169 sent; (7) 146 received/41 sent; (8) 179 received/38 sent; (9) 186 received/63 sent; and (10) 252 received/84 sent.

- For the broader group of 49 outlets, the fraudulent money transfers resulted in more than $3 million in consumer losses during the six-month period. For the 23 highest fraud outlets, the fraudulent transfers resulted in more than $2 million in consumer losses during the six-month period.

84. The April 2007 Spreadsheets also reflected that many of the 49 outlets had had a high percentage of their total number of received money transfers reported as fraudulent in prior years. For example, 10 of the outlets had the following percentages of their received money

27

transfers reported as fraudulent during calendar years 2005 and 2006, respectively: (1) 13.1% and 12.2%; (2) 12.0% and 16.2%; (3) 13.5% and 11.2%; (4) 11.9% and 10.9%; (5) 25.3% and 11.0%; (6) 13.3% and 15.2%; (7) 18.6% and 12.1%; (8) 18.5% and 11.5%; (9) 9.1% and 14.6%; and (10) 15.3% and 11.6%.

85. During the above-referenced six-month period, the expected dollar value for legitimate money transfers from the United States to Canada was under $1,000. Therefore, officials within MoneyGram's Fraud and AML Compliance Departments considered an average dollar value for money transfers between the United States and Canada exceeding $1,000 as another indicator of fraud. The April 2007 Spreadsheets revealed that for many of the above-referenced 49 outlets, the average dollar value for their received money transfers exceeded $1,000 and even $2,000. For example, for the 23 highest fraud outlets on the April 2007 Spreadsheets, 22 had an average dollar value for their received money transfers of at least $1,000, 17 had an average dollar value for their received money transfers of at least $1,500, and eight had an average dollar value for their received money transfers of at least $2,000.

### ii. Haider Failed to Terminate Most of the Outlets Identified On the April 2007 Spreadsheets

86. Despite the Fraud Department's proposal to terminate the above-referenced outlets, most of them remained affiliated with MoneyGram throughout Haider's employment at the Company. For example, of the broader group of 49 outlets identified on the April 2007 Spreadsheets: (1) only seven were terminated by MoneyGram during Haider's employment at the Company as a result of fraud; and (2) at least 33 were still affiliated with MoneyGram at the time Haider left the Company.[3] Similarly, of the 23 highest fraud outlets: (1) only three were

---

[3] Two of those 33 outlets, while still affiliated with MoneyGram at the time Haider left the Company, appear to have stopped sending or receiving money transfers as of June 25, 2007,

terminated by MoneyGram during Haider's employment at the Company as a result of fraud; and (2) at least 18 were still affiliated with MoneyGram at the time of Haider's departure.[4] Notably, by August 2009, MoneyGram had terminated each of the above-referenced 33 outlets (of which the 23 highest fraud outlets were a subset). If Haider had implemented either of the discipline policies referenced above in paragraphs 69 and 70, 32 of those 33 outlets would have been terminated no later than April 2007.

87. Although MoneyGram placed a few of the 49 outlets referenced in the April 2007 Spreadsheets on "send only" status (meaning that they could send but not receive money transfers), that response was clearly inadequate as to those unambiguously high-risk outlets. As early as 2005, senior officials within MoneyGram's Fraud Department recognized that placing such outlets on "send only" status was not sufficient. Indeed, by email dated February 2, 2005, the then Director of AML Compliance and Fraud (who also held that position in April 2007) wrote the following in response to a suggestion that a problem outlet be placed on "send only" status: "[P]lease be aware that we continue to see agents who are on send status surfing fraud transaction[s]. For example, I just found another situation where [an outlet that had been placed on 'send only' status] surfed a transaction that was then paid out at [another outlet]."[5] In another email from 2005 — this one dated December 8, 2005 — another Fraud Department employee

---

and August 18, 2007, respectively. From May 1, 2007, through June 25, 2007, the first of those two outlets received approximately 95 fraud-induced money transfers, totaling more than $90,000 in consumer losses.

[4] One of those 18 outlets is the outlet referenced above that appears to have stopped sending or receiving money transfers as of June 25, 2007.

[5] "Surfing" refers to the situation where one outlet — typically one that has been placed on "send only" status — uses MoneyGram's money transfer system to identify a fraud-induced money transfer for the purpose of contacting another outlet — which has not been placed on "send only" status — and directing that second outlet to "receive" the fraudulent money transfer and extract the fraudulently sent funds from MoneyGram's money transfer system.

resisted placing a problem outlet on "send only" status, stating, "We have tried restricting agents of concern to 'send' only in the past and that did not resolve the matter."

### iii. Four of the Non-Terminated Outlets were Owned and/or Operated by the Same Individual, and Were Involved in Money Laundering

88. Of the 49 outlets identified on the April 2007 Spreadsheets, four of them — Money Spot, Money Spot 2, Money Spot 5, and N&E Associates — were owned and/or operated by the same individual, James Ugoh. The April 2007 Spreadsheets reflected that, during the above-referenced six month period, those four outlets had collectively accumulated 150 Consumer Fraud Reports, totaling more than $300,000 in consumer losses. The April 2007 Spreadsheets also revealed that, during the six-month period, the four outlets accounted for 5.9% of all reported fraud involving money sent through MoneyGram's money transfer system to Canada. Yet none of those outlets was terminated during Haider's employment at MoneyGram, notwithstanding that, as early as 2004, Haider was on notice that Money Spot was engaging in fraud. Indeed, in an email dated August 19, 2004, MoneyGram's then Director of AML Compliance and Fraud informed Haider that there was fraud occurring at Money Spot, and that the Toronto Police Department regarded Money Spot as "dirty." Specifically, the Director wrote to Haider:

> Hi Tom, I wondered if you had a chance to look over the report I gave you on Canada agents that we'd like to close due to high incidents of consumer fraud. We have also had surfing and wrong payouts at many of these agents. *We have had three more reports of cashiers check/internet fraud at Money Spot in Toronto. Toronto PD also called me — they think this agent is dirty.* We are anxious to move forward in closing all of most of [sic] these agents . . . .

(Emphasis added).

89. In the above-referenced DPA, MoneyGram admitted that, beginning in 2006 and continuing into early 2009, Ugoh — the above-referenced owner and/or operator of multiple