MoneyGram outlets, including four that were included on the April 2007 Spreadsheets — conspired with other MoneyGram agents in the Toronto area in an extensive money laundering scheme to conceal the identities of the recipients of proceeds from consumer fraud schemes. Complicit MoneyGram agents in Canada received the initial fraudulent transaction from the victim via MoneyGram's money transfer system. The complicit MoneyGram agents then executed their money laundering scheme by making MoneyGram transfer checks payable to one of a few individuals responsible for laundering the money, instead of the fictitious payee to whom the victim believed the money was being sent. The checks were then collected and deposited into business accounts controlled by the individuals laundering the money. This practice, known as "check pooling," allowed Ugoh and others to deposit the checks into what appeared to be legitimate bank accounts, and then ultimately withdraw and distribute the proceeds among the perpetrators.

90.   Employees within MoneyGram's Fraud and AML Compliance Departments were on notice of the above-referenced check-pooling scheme — and of Ugoh's outlets' involvement in it — no later than January 2007. In January 2007, MoneyGram's then Director of AML Compliance and Fraud, as well as other members of MoneyGram's Fraud Department, received an email from an employee in MoneyGram's Agent Services Department indicating that multiple MoneyGram outlets, including Money Spot and N&E Associates, were participating in a check-pooling scheme whereby: (1) the afore-mentioned outlets transferred the proceeds of fraudulent received transactions to another MoneyGram outlet, "Modicom Accounting"; and (2) Modicom Accounting then deposited the fraud proceeds into a single bank account in its name. In response, one member of the Fraud Department wrote the following to other Fraud Department

personnel, including the then Director of AML Compliance and Fraud: "Modicom is a suspect agent location that we're aware of . . . ."

91. None of the above-referenced outlets — Money Spot, N&E Associates or Modicom Accounting — was terminated during Haider's tenure at MoneyGram; all were terminated within one year of his departure.

92. In addressing MoneyGram's failure to terminate outlets that the Fraud Department had recommended for termination in early 2007, Haider has since acknowledged that "[t]hey don't seem to be [close calls on whether to terminate]." He further stated: "I'm thinking I must have dropped the ball somewhere. . . . I mean business might have asked for more data, as I said, but at some point we should have gone forward and terminated them." When asked specifically, "[w]hose fault is [it] . . . [t]hat Money Spot was not closed, who's fault?" Haider responded, "I told you the buck stops with me."

      **iv. Subsequent to April 2007, Outlets Identified on the April 2007 Spreadsheets Continued to Engage in Fraud**

93. After April 2007, MoneyGram continued to receive complaints from its customers indicating that outlets that had been identified on the April 2007 Spreadsheets were continuing to engage in fraudulent schemes. For example, from May 2007 through May 2008 (when Haider left MoneyGram): (1) Money Spot accumulated approximately 345 Consumer Fraud Reports, totaling more than $600,000 in consumer losses; (2) Money Spot 2 accumulated approximately 67 Consumer Fraud Reports, totaling more than $80,000 in consumer losses; (3) Money Spot 5 accumulated approximately 36 Consumer Fraud Reports, totaling more than $26,000 in consumer losses; and (4) N&E Associates accumulated approximately 40 Consumer Fraud Reports, totaling more than $90,000 in consumer losses. At least 48 of the above-

referenced Consumer Fraud Reports were filed by individuals located in New York State, and seven of those 48 reports were filed by individuals located in the Southern District of New York.

### 3. Haider Allowed the Sales Department to Influence the Agent/Outlet Discipline Process

94. In addition to failing to implement a discipline policy and failing to terminate known high-risk agents, Haider allowed the agent/outlet review process to function such that when the Fraud Department wanted to terminate an agent/outlet, it generally had to consult with the Sales Department before doing so. In an email dated June 25, 2007, a MoneyGram employee with responsibilities related to AML compliance and fraud (who had previously been the Director of AML Compliance and Fraud) informed MoneyGram's then Director of Fraud (who had recently been hired) that before closing an agent, "[w]e need to go to management and sales to make the case to close." This consultation process resulted in instances where efforts by the Fraud Department to terminate or otherwise discipline known high-risk agents were frustrated or delayed.

95. Haider had the authority to terminate agents/outlets. Therefore, to the extent the Sales Department or others successfully resisted any such terminations — including in connection with the April 2007 Spreadsheets — Haider allowed it to happen.

### B. Haider Failed to Implement Policies to Ensure that MoneyGram Complied with Its Obligation to File Timely SARs

96. Although Haider was well aware of the nature and extent of the consumer fraud information collected and maintained by the Fraud Department, he maintained MoneyGram's AML program such that the analysts responsible for filing SARs ("SAR analysts") were not provided with information from the Fraud Department's Consumer Fraud Report database, including information identifying specific outlets that had accumulated excessive numbers of

Consumer Fraud Reports. Moreover, Haider did not otherwise ensure that the Fraud Department shared relevant information with the SAR analysts, or provide adequate direction to staff on when SARs should be filed relating to fraud. As a result, the Fraud Department failed to refer incidents of known or suspected consumer fraud or money laundering to the SAR analysts. Consequently, those analysts lacked the information they needed to file the required SARs. This arrangement — maintaining separate "silos" of information within MoneyGram's various departments such that MoneyGram's SAR analysts did not possess relevant information — was in place throughout Haider's employment at MoneyGram.

97.     Haider's failure to ensure that the Fraud Department provided relevant information to MoneyGram's SAR analysts was contrary to guidance he received from one of MoneyGram's external AML compliance consultants in 2005. The consultant advised Haider as follows:

> Recently, financial institutions have been criticized for not including within their SAR monitoring procedures activity occurring at different business lines or locations. For example, a bank was recently the subject of criminal and civil sanctions, in part, because of its failure to file SARs on fraudulent activity that was the subject of substantial litigation within the bank. In this instance, its litigation department was defending the bank against claims by numerous investors who had been victimized by in [sic] an illegal investment scheme run by customers of the bank. Unfortunately, the department did not inform its AML office and no SARs were filed. The failure of the bank to file SARs in this instance led, in part, to the criminal charges against the bank and a $40 million criminal forfeiture.
>
> In another recent case, a bank faced substantial criminal and civil sanctions for failing to file SARs on customers who were named in grand jury subpoenas received by the bank. While the AML regulatory requirements that apply to banks are different from those for MSBs, it is important that [MoneyGram's] AML compliance office receive information about suspected criminal activity no matter where in the organization that activity may have been discovered. Similarly, it is recommended that when MoneyGram receives federal or state grand jury subpoenas it should consider notifying the AML office (or some other centralized office) so that a determination can be made whether to investigate the matter further and, in appropriate cases, to file a SAR if the subject of the subpoena had utilized [MoneyGram's] financial products.

98. In late 2007, a different AML consultant recommended that Haider consider developing a formal policy and providing further guidance to staff with respect to the situations in which SARs should be filed that are related to fraud.

99. Haider's failure to ensure that MoneyGram's SAR analysts received all relevant information, and that MoneyGram's fraud and AML personnel were properly trained on the filing of SARs relating to fraud, caused SARs against known high-risk agents/outlets to be filed significantly late or not at all. In some cases, SARs against known high-risk agents/outlets were filed well over a year after MoneyGram personnel had identified suspicious conduct.

100. Additionally, and compounding the consumer harm, many of the SARs that MoneyGram did file incorrectly listed the victim of the fraud as the subject (*i.e.*, the suspected wrongdoer) and/or identified the known or suspected complicit agent merely as the transaction location (*i.e.*, the physical location where the suspicious activity had occurred).

101. Part III *infra* includes specific examples of instances where MoneyGram failed to fulfill its obligation to file timely SARs, including failures that occurred during the Assessment Period.

### C. Haider Failed to Ensure that MoneyGram Performed Proper Audits of Its Agents and Outlets

102. Haider also failed to ensure that MoneyGram complied with the BSA requirement to conduct adequate risk-based audits of its agents/outlets.

103. As an initial matter, MoneyGram did not consistently perform risk-based audits of agents/outlets, even those that it had identified as (1) having accumulated an excessive number of Consumer Fraud Reports, and/or (2) possessing other high-risk characteristics. For example, as of December 2005, MoneyGram had not done any compliance audits in Canada. Yet, prior to that date, the Fraud Department suspected that numerous agents/outlets in Canada were

participating in fraud. One such outlet was recommended by the Fraud Department for "closure/restriction" as early as January 2005. A January 2005 document recommending the "closure/restriction" of that outlet indicted that the outlet had opened in February 2003 and, as of January 2005, had: (1) "56 reported complaints of consumer fraud . . . totaling $104,166"; and (2) processed 950 receive transactions, 869 of which were sent from the United States. This same outlet was later identified on spreadsheets that were sent to Haider on or about March 15, 2007, as having received 44 fraud-induced money transfers in 2005 and 26 fraud-induced money transfers in 2006, which constituted 17.9% and 9.4% of the outlet's total number of received money transfers for those years, respectively. Moreover, the outlet had the vast majority of its received money transfers originate in the United States, and an average dollar value of received money transfers that exceeded $1,000. Notwithstanding these clear signs of fraud, this outlet remained open throughout Haider's employment at the Company; it was eventually terminated in March 2009.

104. Even after December 2005, MoneyGram did not perform risk-based audits of known high-risk agents/outlets in Canada. For example, Money Spot was not audited during Haider's employment at MoneyGram.

105. Moreover, to the extent MoneyGram performed audits of agents/outlets, they were frequently ineffective. With respect to on-site audits, for example, MoneyGram's former Senior Director of AML Compliance has confirmed that on-site auditors were not trained to look for warning signs of fraud. Nor did on-site auditors otherwise conduct adequate AML reviews. For example, they did not review copies of the MoneyGram transfer checks that the outlets had issued in paying out received money transfers, to see if the checks had been made payable to another MoneyGram outlet. (When one MoneyGram outlet makes a MoneyGram transfer check

payable to another MoneyGram outlet, that is an indication that the outlets are participating in a check-pooling scheme.) This failure to review transfer checks was significant given that no later than January 2007, MoneyGram's then Director of AML Compliance and Fraud, as well as other members of MoneyGram's Fraud Department, possessed evidence demonstrating that various MoneyGram outlets were participating in a check-pooling scheme, as discussed above.

106. An email chain dated July 27, 2007, further demonstrates that, during Haider's tenure at MoneyGram, the Company's oversight of its agents/outlets was flawed and ineffective. In that email chain, a member of MoneyGram's Risk Department described his recent visits to multiple agents/outlets in Canada that were known or suspected to be participating in fraud and/or money laundering schemes to two members of MoneyGram's Fraud Department. These visits — which were informal and did not constitute "audits" — were similarly ineffective:

- Describing his visit to one particular outlet (which was one of the outlets identified on the April 2007 Spreadsheets), the Risk Department employee stated that he "didn't feel confident [sic] taking a picture of the place because [the agent's brother] looks like an enforcer (big guy that says little)." The Risk Department employee further stated that when the agent complained about the outlet's daily transaction limit, he (the Risk Department employee) "didn't feel it was the place to say to stop committing fraud and your limit won't be a problem." The Risk Department employee also noted that the agent was "a former . . . agent [of another money transmission company]," which the Risk Department employee stated "didn't surprise [him]." Subsequently, one of the Fraud Department employees wrote to the other: "Says a lot that he didn't feel comfortable taking a picture." This outlet remained open throughout Haider's employment at MoneyGram; it was terminated in March 2009.

- In the same July 27, 2007, email exchange, the MoneyGram Risk Department employee also described his interactions with another agent whose outlet had accumulated more than 130 Consumer Fraud Reports during the prior year (and was also identified on the April 2007 Spreadsheets): "Several weeks before my visit[] I spoke with [the agent] about the receive transactions and NSFs [transactions with insufficient funds]. At that time I warned him about the fraud and advised him we are watching all transactions. He got a good laugh and seemed to be very happy to see me." The Risk Department employee observed that this agent was also a former agent of another money transmission company. Notably, in January 2007, one of the Fraud Department employees on this email exchange had identified this agent's outlet as one of the outlets involved in the check-pooling scheme described in paragraph 90 above. This outlet

remained open throughout Haider's employment at MoneyGram; it too was terminated in March 2009.

- In the same email exchange, the Risk Department employee stated that he had met James Ugoh, the owner/operator of the Money Spot outlets and N&E Associates: "I met Chief James Ugoh. I liked him, seems to be a genuine person. He is also very interest [sic], he is the younger chief and has been appointed the next elder chief of his tribe. . . . James also works at [a car rental company] (2nd shift) in [its] maintenance department. I found this very odd for a Chief and owner of 10 stores." Subsequently, one of the Fraud Department employees emailed the other: "Geez . . . ridiculous. Especially when he says 'I met Chief James Ugoh. I liked him, seems to be a genuine person.' Of course he's gonna act genuine even though his stores have probably paid over 200 fraud combined." All of Ugoh's outlets remained open throughout Haider's employment at MoneyGram, and all were terminated thereafter.

107. Notably, some MoneyGram agents/outlets that Haider failed to terminate were not subjected to audits precisely because the agents/outlets were understood to be engaging in fraud. In connection with the initial list of approximately 30 outlets that the Fraud Department had recommended for termination in early 2007, MoneyGram's former Senior Director of AML Compliance did not have her staff conduct audits of those outlets because she was already "working with the assumption that the[y] were criminal operations," and sending MoneyGram's audit team into those outlets would put them in "physical danger." The former Senior Director of AML Compliance "strongly" expressed this view to Haider in 2007. As set forth above, the majority of those outlets were not terminated by Haider, including Money Spot, which the former Senior Director of AML Compliance has characterized as "the worst of even the group of agents that we were concerned about."

108. Moreover, throughout Haider's employment at MoneyGram, MoneyGram's process of identifying agents/outlets to audit was fundamentally flawed and ineffective due to a lack of information sharing between the Fraud and AML Compliance Departments. When the AML Compliance Department decided which agents/outlets to audit, it did not consider the number of Consumer Fraud Reports that MoneyGram's agents/outlets had accumulated.

MoneyGram's former Senior Director of AML Compliance has since acknowledged that agents with highly elevated levels of fraud presented a higher risk of money laundering.

### D. Haider Failed to Ensure that MoneyGram Adequately Screened New Agents and Outlets

109. Throughout his employment at MoneyGram, Haider also failed to ensure that MoneyGram conducted adequate due diligence on prospective MoneyGram agents. Similarly, Haider failed to ensure that MoneyGram conducted adequate due diligence on existing MoneyGram agents seeking to open additional MoneyGram outlets.

110. Under Haider, MoneyGram personnel allowed new agents to open outlets, and existing agents to open additional outlets, without taking steps to verify that a legitimate business did or could exist at the proposed outlet sites. As a result, MoneyGram agents were permitted to operate outlets out of homes in residential neighborhoods and other locations that were not open to the public. Agents operating out of such locations were clearly not offering legitimate money transmission services. For example, Money Spot 9 operated out of a house in a residential neighborhood. Similarly, due to the lack of an adequate review process, Ugoh was allowed to open Money Spot 7 in a location only a few feet away from Money Spot 5. Money Spot 5 was located at 1708 Weston Road in Toronto, while Money Spot 7 was located at 1714 Weston Road in Toronto.

111. Additionally, under Haider, MoneyGram allowed numerous agents to open MoneyGram outlets despite the fact that the agents had previously been terminated by another money transmission company. In evaluating new agents, MoneyGram did not inquire whether they had previously been terminated by another money transmission company, notwithstanding that MoneyGram personnel recognized that prior terminations were an indicator of fraud. In an email dated February 2, 2005, MoneyGram's then Director of AML Compliance and Fraud

observed that when an agent sought to become affiliated with MoneyGram after being affiliated with another money transmission company, it was likely that the agent had been terminated by the other money transmission company "due to fraud concerns." Moreover, as set forth in paragraph 106 above, personnel within MoneyGram's Fraud and Risk Departments knew or suspected that agents that had come to MoneyGram from another money transmission company were engaging in fraud while at MoneyGram.

112.  The lack of coordination between MoneyGram's various departments also resulted in MoneyGram granting additional outlets to agents known or suspected to be involved in fraud and/or money laundering. For example, by the time of Haider's separation from MoneyGram in May 2008, MoneyGram had allowed Ugoh to expand his network to 12 outlets. As of March 2008, Fraud Department personnel understood that multiple of those outlets were participating in fraud and/or money laundering schemes. Nevertheless, during that month, Ugoh was authorized to open the last of his outlets, Money Spot 11, even though his other outlets had by then accumulated more than 750 Consumer Fraud Reports, totaling well over $1 million in consumer losses.

### III.  HAIDER WILLFULLY FAILED TO ENSURE THAT MONEYGRAM FILED TIMELY SUSPICIOUS ACTIVITY REPORTS

113.  As set forth above in Part II.B, under Haider, MoneyGram's AML program was fundamentally flawed because the Fraud Department did not share important information with the analysts responsible for filing SARs. Among other things, information from the Consumer Fraud Report database was not provided to those SAR analysts. Nor did the Fraud Department have a consistent practice of communicating its concerns about particular agents or outlets to the SAR analysts. Haider also failed to provide adequate direction to staff regarding the filing of SARs relating to fraud. As a result, there were numerous agents/outlets that had accumulated an