extraordinary number of Consumer Fraud Reports and/or that members of the Fraud Department had identified as likely participating in fraud and/or money laundering, but for which MoneyGram: (1) did not file any SARs; (2) filed SARs, but exceedingly late; or (3) filed SARs, but improperly identified the suspect agents/outlets merely as the transaction locations (*i.e.*, the physical locations where the suspicious activity had taken place), rather than the subjects of the SARs (*i.e.*, the suspected wrongdoers).

### A. Examples of SAR Violations Involving Agents/Outlets that Had Accumulated Excessive Numbers of Consumer Fraud Reports and Other Red Flags

114.   A January 30, 2007, email from MoneyGram's then Director of AML Compliance and Fraud to, among others, its then Senior Director of AML Compliance illustrates the Company's deficient SAR-filing practices under Haider. The Director explained that a particular outlet in Houston, Texas, had been closed in 2006 after "Fraud . . . review[ed its] activity and found 46 reported consumer fraud payouts at th[e] location," which "was 9% of total receives and unacceptable." The Director said that she "plan[ned] to say only that to the examiners." The Director then went on to state:

> This activity was after we stopped directed sends to Canada. It appear[s] that the owners or others at [this outlet] were working with individuals in Canada. Once the funds could not be paid in Canada, the fraud perps found locations in the USA and directed those locations to receive the funds and send the money to CD [Canada] after taking a cut. **I don't want to go into this level because I'm not sure if SARs were filed on the agent at the time — we should have. We closed several locations in TX and several in NY that all had the same pattern of involvement in CD [Canadian] lottery fraud.**

(Emphasis in original). In other words, MoneyGram's Director of AML Compliance and Fraud had identified this outlet as having likely participated in a fraudulent scheme. MoneyGram personnel referred to this type of scheme as "flipping," where a fraudulent outlet in the United States received a fraud-induced money transfer and then immediately sent (or flipped) the money to another fraudulent outlet in Canada. Additionally, in March 2007, MoneyGram received a

41

law enforcement subpoena directed at this outlet. However, MoneyGram did not file a SAR on this outlet or its agent/owner at the time it closed the outlet, at the time it received the subpoena, or at any other time during Haider's employment at MoneyGram.

115. Similarly, in March 2007, a Fraud Department analyst identified Abbey One Stop, a MoneyGram outlet in Orange, New Jersey, as a potential participant in the same type of flipping scheme referenced in the prior paragraph. In August 2007, another MoneyGram employee sent the then Director of Fraud an email identifying five "Bad Agents" that "receive consumer fraud," one of which was "Abbey One Stop" (the outlets discussed below in paragraphs 116 and 117 were also identified in this email). A few months later, in January 2008 and February 2008, MoneyGram received two law enforcement subpoenas directed at Abbey One Stop. Shortly thereafter, on April 4, 2008, multiple Fraud Department employees, including the Director of Fraud, received an email from another MoneyGram employee suggesting that Abbey One Stop had improperly removed funds from MoneyGram's money transfer system. The email further noted, "[w]e have received several complaints about . . . Abbey One Stop . . . . Other cases involve consumer fraud and it is received at this particular agent." From October 2006 through April 23, 2008 (*i.e.*, approximately 30 days before the end of the Assessment Period), Abbey One Stop accumulated approximately 156 Consumer Fraud Reports, totaling more than $395,000 in consumer losses. Moreover, during the period from November 15, 2007 (*i.e.*, the beginning of the Assessment Period), through April 23, 2008, Abbey One Stop accumulated approximately 28 Consumer Fraud Reports, totaling more than $70,000 in consumer losses. (At least three of those Consumer Fraud Reports were filed by individuals located in New York State, each of whom reported a loss of more than $3,000.) And, during the six months immediately preceding the Assessment Period, Abbey One Stop accumulated

approximately 75 Consumer Fraud Reports, totaling more than $190,000 in consumer losses. (At least three of those Consumer Fraud Reports were filed by individuals located in New York State, each of whom reported a loss of more than $2,000.) Nevertheless, MoneyGram did not file a SAR identifying Abbey One Stop or its agent/owner, Festus Abbey ("Abbey"), as the subject until April 2009.[6] Abbey ultimately pled guilty to one count of conspiracy to commit mail and wire fraud in connection with consumer fraud schemes, and was sentenced to 41 months' imprisonment. Abbey One Stop remained a MoneyGram outlet throughout Haider's employment at the Company; it was terminated in August 2009.

116. As another example of MoneyGram's deficient SAR-filing practices under Haider, in February 2006, a Fraud Department analyst identified an outlet in San Ysidro, California, as having a high number of fraud payouts and recommended that action be taken against the outlet. Thereafter, in August 2007, the then Director of Fraud identified the same outlet as having accumulated more than 200 Consumer Fraud Reports during the seven-month period from January 2007 through July 2007, totaling approximately $300,000 in consumer losses. (At least nine of those Consumer Fraud Reports were filed by individuals located in New York State, seven of whom reported a loss of at least $1,000 and two of whom reported a loss of at least $2,000. Moreover, three of those nine Consumer Fraud Reports were filed by individuals located in the Southern District of New York.) In August 2007, the Director of Fraud recommended that this outlet be terminated immediately, characterizing it as one of the "worst of the worst." However, the outlet was not terminated, and from November 15, 2007, through April

---

[6] When this complaint refers to an outlet or its agent/owner not being identified as the "subject" of a SAR, it means that neither the outlet nor its agent/owner was identified as a potential wrongdoer in a SAR; at most, the outlet was identified in one or more SARs merely as the physical location from which one or more of the money transfers at issue in the SAR(s) had been sent or received.

23, 2008, it accumulated approximately 130 more Consumer Fraud Reports, totaling nearly $200,000 in consumer losses. (At least six of those Consumer Fraud Reports were filed by individuals located in New York State, and one of those six reports was filed by an individual located in the Southern District of New York, who reported a loss of $2,450.) During Haider's employment at MoneyGram, the Company did not file any SARs identifying this outlet or its agent/owner as the subject; it first filed such a SAR in April 2009. The outlet remained a MoneyGram outlet throughout Haider's employment at the Company; it was terminated in June 2009.

117. In August 2007, the Director of Fraud also identified another outlet — this one located in Brooklyn, New York — as a high fraud outlet. At that time, the Director of Fraud observed that this outlet had accumulated 41 Consumer Fraud Reports since January 2007, totaling approximately $65,000 in consumer losses. Thereafter, the outlet continued to accumulate a significant number of Consumer Fraud Reports. From November 15, 2007, through April 23, 2008, it accumulated approximately 18 Consumer Fraud Reports, totaling more than $55,000 in further consumer losses. And, during the six months preceding the Assessment Period, the outlet accumulated approximately 30 Consumer Fraud Reports, totaling more than $70,000 in consumer losses. In late 2007 or early 2008, the Director of Fraud identified this outlet as one of the top three fraud outlets in New York. Yet, during Haider's employment at MoneyGram, the Company did not file any SARs identifying this outlet or its agent/owner as the subject; it first filed such a SAR in April 2009. The outlet remained open throughout Haider's employment at the Company; it was terminated in May 2009.

118. In late 2007 or early 2008, the Director of Fraud identified yet another outlet — this one located in Houston, Texas — as a high fraud outlet, and one of the top two fraud outlets

in Texas. At that time, the Director of Fraud noted that the outlet had accumulated 95 Consumer Fraud Reports in 2007, totaling more than $230,000 in consumer losses. Moreover, from November 15, 2007, through April 23, 2008, this outlet accumulated approximately 80 Consumer Fraud Reports, totaling more than $210,000 in consumer losses. (At least one of those Consumer Fraud Reports was filed by an individual located in the Southern District of New York, who reported a loss of $1,600.) And during the six months immediately preceding the Assessment Period, the outlet accumulated approximately 51 Consumer Fraud Reports, totaling more than $130,000 in consumer losses. (At least four of those Consumer Fraud Reports were filed by individuals located in New York State, all of whom reported a loss of more than $2,000.) In March 2007, MoneyGram received a law enforcement subpoena directed at this outlet. (During that same month, an individual located in the Southern District of New York filed a Consumer Fraud Report on this outlet, reporting a loss of $2,850.) Despite all of the above, MoneyGram did not file a SAR identifying this outlet or its agent/owner as the subject during Haider's employment at the Company; it first filed such a SAR in April 2009. The outlet remained a MoneyGram outlet throughout Haider's employment at the Company; it was terminated in May 2009.

119.   Below are additional examples of MoneyGram outlets that, during Haider's employment at the Company, accumulated an excessive number of Consumer Fraud Reports and yet were not identified as the subject of any timely-filed SARs:

- Miracle Multi-Link, a MoneyGram outlet in Brooklyn, New York, accumulated more than 340 Consumer Fraud Reports, totaling over $1.2 million in consumer losses, from 2007 through 2009. The owner of this outlet, Itohan Agho Allen, was ultimately convicted of conspiracy to commit mail fraud, wire fraud, and money laundering, and sentenced to 180 months' imprisonment. During Haider's employment at MoneyGram, the Company did not file any SARs identifying this agent/outlet as the subject, notwithstanding that: (1) in late 2007 or early 2008, the Director of Fraud received a spreadsheet identifying this outlet as among the top five fraud outlets in New

45

York (the spreadsheet noted that in 2007, the outlet had received 17 Consumer Fraud Reports, totaling more than $47,000 in consumer losses); and (2) from November 15, 2007, through April 23, 2008, the outlet accumulated approximately 55 Consumer Fraud Reports, totaling more than $180,000 in consumer losses. (At least one of those Consumer Fraud Reports was filed by an individual located in New York State, who reported a loss of $3,620.) Miracle Multi-Link remained a MoneyGram outlet throughout Haider's employment at the Company; it was terminated in May 2009.

- An additional MoneyGram outlet located in Austell, Georgia accumulated more than 360 Consumer Fraud Reports, totaling over $1 million in consumer losses, from 2007 through 2008. During Haider's employment at MoneyGram, the Company did not file any SARs identifying this outlet or its agent/owner as the subject, notwithstanding that, from November 15, 2007, through April 23, 2008, the outlet accumulated approximately 30 Consumer Fraud Reports, totaling more than $75,000 in consumer losses. (At least three of those Consumer Fraud Reports were filed by individuals located in New York State, each of whom reported a loss of more than $2,000.) And during the six months immediately preceding the Assessment Period, the outlet accumulated approximately 33 more Consumer Fraud Reports, totaling more than $95,000 in additional consumer losses. (At least three of those Consumer Fraud Reports were filed by individuals located in New York State, each of whom reported a loss of more than $2,000, and one of whom was located in the Southern District of New York.) This outlet remained open throughout Haider's employment at MoneyGram; it was terminated in January 2009.

- Another MoneyGram outlet located in Houston, Texas, accumulated more than 160 Consumer Fraud Reports, totaling over $530,000 in consumer losses, from 2007 through 2008. During Haider's employment at MoneyGram, the Company did not file any SARs identifying this outlet or its agent/owner as the subject, notwithstanding that, from November 15, 2007, through April 23, 2008, the outlet accumulated approximately 48 Consumer Fraud Reports, totaling more than $135,000 in consumer losses. (At least three of those Consumer Fraud Reports were filed by individuals located in New York State, each of whom reported a loss of more than $1,000, and one of whom reported a loss of $4,500.) This outlet remained open throughout Haider's employment at MoneyGram; it was terminated in January 2009.

- During the period from November 15, 2007, through April 23, 2008, the additional outlets referenced in the chart below also accumulated an excessive number of Consumer Fraud Reports. (At least 13 of those Consumer Fraud Reports were filed by individuals located in New York State, nine of which reported a loss of more than $2,500. Moreover, three of those 13 reports were filed by individuals located in the Southern District of New York.) However, during Haider's employment at MoneyGram, the Company did not file any SARs in which any of the below outlets or their agent/owners were identified as the subject. Notably, in November 2007, MoneyGram received a law enforcement subpoena targeting one of the below outlets (the one with 89 Consumer Fraud Reports). Moreover, in late 2007 or early 2008, the Director of Fraud received a spreadsheet identifying this outlet as among the top five fraud outlets in Texas (the

46

spreadsheet noted that in 2007, the outlet had received 39 Consumer Fraud Reports, totaling more than $135,000 in consumer losses). In an email dated April 3, 2008, a MoneyGram employee with responsibilities relating to AML compliance and fraud (who had previously been the Director of AML Compliance and Fraud) wrote the following to, among others, the then Director of Fraud about that outlet: "Are you looking into [the outlet] and [its] potential involvement in consumer fraud? I attempted to confirm rcvr info on 3-4 transactions and nothing checked out . . . . My concern is that this is another agent in [Texas] who is working with the Nigerians in Canada on consumer frauds . . . ." (At least four of the Consumer Fraud Reports that were filed on this outlet during the period November 15, 2007, through April 23, 2008, were filed by individuals located in New York State, and one of those four reports was filed by an individual located in the Southern District of New York.)

| Outlet Location | Approximate Number of Consumer Fraud Reports Accumulated From 11/15/07 Through 4/23/08 | Losses Associated with Consumer Fraud Reports Referenced in Prior Column | Date Terminated by MoneyGram |
|---|---|---|---|
| Austell, Georgia | 70 | $106,957.04 | 3/11/09 |
| Rialto, California | 49 | $147,677.02 | 11/10/08 |
| Newark, New Jersey | 53 | $169,186.17 | 6/1/09 |
| Houston, Texas | 89 | $300,074.59 | 12/31/08 |
| Houston, Texas | 87 | $259,569.16 | 11/13/08 |
| Brooklyn, New York | 37 | $129,273.93 | 11/7/08 |

B.   **Examples of SAR Violations Involving Agents/Outlets that Had Been Proposed to Haider for Termination**

120.   Under Haider, MoneyGram also failed to file timely SARs on a number of the specific outlets that were proposed to him and others for termination in April 2007. Nor were SARs filed on those outlets' agent/owners. As discussed above, Ugoh owned and/or operated four of those outlets: Money Spot, Money Spot 2, Money Spot 5, and N&E Associates. Although Ugoh operated these and his nine other outlets in Canada, the outlets received more

47

than $27.8 million in money transfers from the United States. Ugoh has admitted that almost all of the money his outlets received from the United States constituted fraud proceeds.

121.  Haider was on notice of Ugoh's fraudulent activities as early as 2004, and of those activities' connection to U.S. consumers no later than April 2007, when he was sent the above-referenced April 2007 Spreadsheets. *See supra* Part II.A.2.b. Those spreadsheets included the following information for Money Spot, Money Spot 2, Money Spot 5, and N&E Associates, relating to the six-month period from September 2006 through February 2007:

| Outlet Name | # of Received Transactions Reported as Fraudulent | % of Received Transactions Reported as Fraudulent | $ Amount of Fraud-Induced Transactions | # of Received Transactions | # of Received Transactions from the U.S. | % of Received Transactions from the U.S. |
|---|---|---|---|---|---|---|
| Money Spot | 36 | 5.80% | $84,067.37 | 621 | 517 | 83.25% |
| Money Spot 2 | 21 | 7.34% | $40,699.07 | 286 | 259 | 90.56% |
| Money Spot 5 | 58 | 9.34% | $99,489.26 | 621 | 560 | 90.18% |
| N&E Associates | 35 | 10.29% | $79,730.70 | 340 | 321 | 94.41% |

The April 2007 Spreadsheets also revealed that Money Spot, Money Spot 2, Money Spot 5, and N&E Associates had high percentages of their total number of received money transfers reported as fraudulent in prior years as well:

| Outlet Name | % of Received Transactions Reported as Fraudulent in 2006 | % of Received Transactions Reported as Fraudulent in 2005 | % of Received Transactions Reported as Fraudulent in 2004 |
|---|---|---|---|
| Money Spot | 8.7% | 7.8% | 4.49% |
| Money Spot 2 | 8.27% | 7.04% | 1.3% |
| Money Spot 5 | 10.42% | Not open yet | Not open yet |
| N&E Associates | 11.22% | 13.58% | 7.41% |

48

Additionally, the April 2007 Spreadsheets indicated that MoneyGram had received law enforcement subpoenas directed at Money Spot, Money Spot 2, Money Spot 5, and N&E Associates. In fact, MoneyGram had received law enforcement subpoenas directed at those outlets in June 2005 (Money Spot), August 2005 (Money Spot), March 2006 (Money Spot, Money Spot 2 and N&E Associates), May 2006 (Money Spot, Money Spot 2 and N&E Associates), and February 2007 (Money Spot, Money Spot 2 and Money Spot 5). During Haider's employment at MoneyGram, the Company also received law enforcement subpoenas directed at Money Spot 4 (February 2007) and Money Spot 6 (March 2007).

122.   Nevertheless, during Haider's employment at MoneyGram, the Company never filed a SAR identifying Ugoh or any of his outlets as the subject. Instead, during that time, MoneyGram facilitated Ugoh's fraudulent activities in a number of ways — and turned a blind eye to his misconduct — as detailed in the following chronology:

- In August 2004, MoneyGram's then Director of AML Compliance and Fraud recognized that Ugoh's initial MoneyGram outlet, Money Spot, had an unusually high number of fraud complaints. In August 2004, the Director of AML Compliance and Fraud also learned, and informed Haider, that the Toronto Police Department regarded Money Spot as "dirty." Nevertheless, that same month, MoneyGram authorized Ugoh to open two additional outlets, Money Spot 2 and Money Spot 3.

- In March 2005, MoneyGram authorized Ugoh to open another outlet, Money Spot 4.

- In November 2005, a Fraud Department analyst identified a number of Canadian outlets that he characterized as "bad," all of which had received between 39 and 127 fraud-induced money transfers in 2005. The analyst recognized that Money Spot had accumulated 46 Consumer Fraud Reports in 2005 and 136 Consumer Fraud Reports in total, and that the 136 Consumer Fraud Reports had resulted in $489,238 in consumer losses.

- In February 2006, MoneyGram's Fraud Department identified Money Spot, Money Spot 2, and N&E Associates as leading fraud outlets.

- In June 2006, MoneyGram authorized Ugoh to open a fifth outlet, Money Spot 5.

- In July 2006, MoneyGram's Risk Department contemplated permanently restricting Money Spot's ability to receive transactions because of fraud, but the restriction was not implemented.

- In August 2006, MoneyGram authorized the opening of Money Spot 6, and the following month, paid Ugoh a $70,000 "re-signing bonus."

- As of January 2007, MoneyGram's then Director of AML Compliance and Fraud and other Fraud Department personnel were on notice that Money Spot was working with other MoneyGram agents in connection with the above-described check-pooling scheme.

- In March 2007, MoneyGram authorized Ugoh to open Money Spot 7 and Money Spot 8, notwithstanding that his other outlets had by then accumulated hundreds of Consumer Fraud Reports. During the month of March 2007 alone, Ugoh's outlets accumulated approximately 35 Consumer Fraud Reports, totaling more than $60,000 in consumer losses.

- In April 2007, MoneyGram's Fraud Department proposed the termination of Money Spot, Money Spot 2, Money Spot 5, and N&E Associates as part of its above-referenced effort to terminate MoneyGram's worst high-fraud Canadian outlets. Despite this proposal, MoneyGram allowed all of Ugoh's outlets to remain open; none of those outlets was closed while Haider was employed at MoneyGram.

- In June 2007, MoneyGram authorized Ugoh to open Money Spot 9 and Money Spot 10.

- In July 2007, MoneyGram awarded Money Spot the status of "Red Store," MoneyGram's corporate marketing award for its top-performing outlets. Also in July 2007, MoneyGram's internal Fraud Report listed Money Spot as one of the Company's top fraud outlets.

- In August 2007, MoneyGram increased Ugoh's commission, and made the commission increase retroactive to September 2006.

- In December 2007, Money Spot again was listed as a top fraud outlet on MoneyGram's internal Fraud Report. Money Spot, Money Spot 2, Money Spot 4, and N&E Associates were all in the top nine for fraud in Ontario. And, in late 2007 or early 2008, MoneyGram's then Director of Fraud identified those four outlets as having received 298 fraud-induced money transfers in 2007, totaling more than $600,000 in consumer losses.