- In February 2008, a MoneyGram employee with responsibilities relating to AML compliance and fraud (who had previously been the Director of AML Compliance and Fraud) identified new potentially fraudulent behavior involving Money Spot, prompting a Fraud Department analyst to write the following in an email to the afore-mentioned employee and the then Director of Fraud: "[Y]ou recall James [Ugoh]. He's the Nigerian Chief that was 'very concerned' with the fraud that ran through his store when we suggested agent closure last year or the year before. He was so concerned, he convinced Sales and Risk he'd call . . . Risk when he felt a fraudster was attempting to receive a transaction. However, what he was doing is calling us on the $800-$1100 transactions and still paying out the higher dollar amounts. I think those phone calls last[ed] about 3 months. This particular store is currently our highest receive location in Toronto."

- In March 2008, MoneyGram authorized Ugoh to open Money Spot 11, notwithstanding that Ugoh's other outlets had by then accumulated more than 750 Consumer Fraud Reports.

- From November 15, 2007, through April 23, 2008, Ugoh's outlets accumulated more than 380 Consumer Fraud Reports, totaling more than $600,000 in consumer losses. (At least 28 of those Consumer Fraud Reports were filed by individuals located in New York State, and five of those 28 reports were filed by individuals located in the Southern District of New York.) Moreover, during the above-referenced period, Money Spot itself accumulated more than 175 Consumer Fraud Reports, totaling more than $280,000 in consumer losses.

123.   Notwithstanding the information set forth in the above chronology — including that Ugoh's outlets had accumulated more than 380 Consumer Fraud Reports from November 15, 2007, through April 23, 2008 — during Haider's employment at MoneyGram, the Company never filed a SAR identifying Ugoh or any of his outlets as the subject.

124.   In September 2008, MoneyGram closed Money Spot 6, and it closed Ugoh's remaining outlets in February 2009. In October 2009, Ugoh was charged with various crimes relating to consumer fraud, and he pled guilty to one count of conspiracy to commit wire fraud and money laundering, as well as one count of mail fraud. Ugoh was subsequently sentenced to 151 months' imprisonment.

125.   In addition to Money Spot, Money Spot 2, Money Spot 5, and N&E Associates, many of the other outlets that were proposed for closure in April 2007 also had (1) tens of

thousands of dollars in fraud-induced transactions and (2) significant contacts with the United States. Two of those outlets are listed below. All of the information that appears below in connection with the two outlets appeared on the April 2007 Spreadsheets.

- Outlet 1. This outlet — which had 26 of its 394 receive transactions (6.6%) reported as fraudulent during the six-month period from September 2006 through February 2007 — had 381 of those 394 receive transactions (96.7%) originate from the United States. The 26 fraudulent receive transactions totaled more than $70,000 in consumer losses.

- Outlet 2. This outlet — which had 61 of its 702 receive transactions (8.6%) reported as fraudulent during the above-referenced six-month period — had 626 of those 702 receive transactions (89.1%) originate from the United States. The 61 fraudulent receive transactions totaled more than $80,000 in consumer losses.

Moreover, at least some of those other outlets that were proposed for termination in April 2007 — including Outlet 1 and Outlet 2 — continued to accumulate significant numbers of Consumer Fraud Reports thereafter. For example, from November 15, 2007, through April 23, 2008, Outlet 1 and Outlet 2 accumulated approximately 25 and 37 Consumer Fraud Reports, respectively. (At least three of those Consumer Fraud Reports were filed by individuals located in New York State, and one of those three reports was filed by an individual located in the Southern District of New York.) During Haider's employment at MoneyGram, the Company also received law enforcement subpoenas directed at Outlet 1 (in February 2008) and Outlet 2 (in March 2007). Moreover, in an email dated April 30, 2008, a Fraud Department analyst observed that Outlet 1 was likely participating in a flipping scheme with another outlet located in New York. Nevertheless, during Haider's employment at MoneyGram, neither Outlet 1 nor Outlet 2 (or their agents/owners) was the subject of a SAR, and neither was terminated. Outlet 1 was ultimately terminated in December 2008, and Outlet 2 was terminated in June 2009.

126.  As a result of MoneyGram's failure to file timely SARs under Haider, the perpetrators of fraudulent schemes were allowed to continue to defraud the public without the

requisite notice being provided to FinCEN. Through FinCEN, law enforcement agencies may access SARs and use them to: (1) initiate criminal and civil investigations; (2) expand existing investigations and uncover previously unidentified co-conspirators and undetected money trails; (3) facilitate information exchange with law enforcement counterparts worldwide; and (4) identify relationships between illicit actors and their financing networks, thereby allowing the disruption of such networks and the prosecution of their participants. Haider's failure to ensure that MoneyGram filed proper and timely SARs deprived law enforcement of critical information it could have used for these purposes.

## CLAIM ONE

### Violation of the Bank Secrecy Act
### (31 U.S.C. § 5318(h) and 31 C.F.R. § 103.125, *currently codified at* 31 C.F.R. § 1022.210)
### Anti-Money Laundering Program Violations

127. The Government incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

128. MoneyGram was required to implement and maintain an effective AML program, as set forth in the BSA and its implementing regulations.

129. As MoneyGram's Chief Compliance Officer, Haider was responsible for ensuring that MoneyGram implemented and maintained an effective AML program.

130. As set forth above, throughout his employment at MoneyGram — including during the Assessment Period — Haider failed to ensure that MoneyGram implemented and maintained an effective AML program. Among other things, Haider failed to: (1) implement a policy for disciplining high-risk agents/outlets; (2) ensure that unambiguously high-risk agents/outlets of which he was on notice were terminated; (3) ensure that there was sufficient coordination between MoneyGram's Fraud Department and MoneyGram's SAR analysts, such

that timely SARs were filed on agents/outlets that the Fraud Department had identified as, among other things, having accumulated an excessive number of Consumer Fraud Reports; (4) ensure that high-risk agents/outlets were subjected to proper audits; or (5) ensure that MoneyGram adequately screened new agents, or existing agents seeking to open new outlets.

131. Haider's above-referenced failures were willful within the meaning of the civil enforcement provisions of the BSA and caused MoneyGram to violate the BSA.

132. Under 31 U.S.C. § 5318(h), 31 U.S.C. § 5321(a), and 31 C.F.R. § 103.125, *currently codified at* 31 C.F.R. § 1022.210, Haider's willful failure to ensure that MoneyGram implemented and maintained an effective AML program rendered him subject to a penalty of $25,000 per day.

133. Haider's willful failure to ensure that MoneyGram implemented and maintained an effective AML program continued throughout the Assessment Period, which comprises approximately 190 days.

134. By reason of the foregoing, the Government is entitled to entry of a judgment against Haider in the amount it is seeking, $1 million; indeed, Haider could have been assessed a penalty for far more than that amount under 31 U.S.C. § 5318(h), 31 U.S.C. § 5321(a), and 31 C.F.R. § 103.125, *currently codified at* 31 C.F.R. § 1022.210.

135. By reason of the forgoing, and pursuant to 31 U.S.C. § 5320, the Government is also entitled to an order enjoining Haider from participating, directly or indirectly, in the conduct of the affairs of any financial institution that is located in the United States or conducts business within the United States, for a term of years sufficient to prevent future harm to the public.

## CLAIM TWO

### Violations of the Bank Secrecy Act
(31 U.S.C. § 5318(g) and 31 C.F.R. § 103.20(a), *currently codified at* 31 C.F.R. 1022.320(a))
### SAR Reporting Violations

136.   The Government incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

137.   MoneyGram was required to file SARs on a timely basis, as set forth in the BSA and its implementing regulations. As MoneyGram's Chief Compliance Officer, Haider was responsible for ensuring that MoneyGram filed timely SARs when it knew, suspected, or had reason to suspect that specific agents and/or outlets were complicit in transactions that (1) involved funds derived from illegal activity or were intended to hide or disguise funds derived from illegal activity, (2) were designed to evade the requirements of the BSA or its implementing regulations, (3) served no business or apparent lawful purpose, or (4) involved the use of MoneyGram's money transfer system to facilitate criminal activity.

138.   As set forth above, Haider failed to ensure that MoneyGram's Fraud Department provided relevant information to the analysts responsible for filing SARs. Haider also failed to ensure that: (1) MoneyGram personnel received adequate guidance on the filing of SARs relating to fraud; or (2) MoneyGram filed timely SARs on agents and/or outlets that MoneyGram personnel knew or suspected were using MoneyGram's money transfer system to facilitate fraudulent activities. This resulted in MoneyGram failing to fulfill its SAR-reporting obligations in connection with specific agents/outlets throughout Haider's employment at MoneyGram, including during the Assessment Period.

139.   Haider's above-referenced failures were willful within the meaning of the civil enforcement provisions of the BSA and caused MoneyGram to violate the BSA.

140. Under 31 U.S.C. § 5318(g), 31 U.S.C. § 5321(a), and 31 C.F.R. § 103.20(a), *currently codified at* 31 C.F.R. § 1022.320(a), Haider's willful failure to ensure that MoneyGram fulfilled its obligation to file timely SARs rendered him subject to a penalty equal to (for each violation) $25,000 or the amount involved in the underlying transaction (not to exceed $100,000), whichever was greater.

141. Haider's willful failure to ensure that MoneyGram fulfilled its obligation to file timely SARs resulted in a significant number of SARs (1) being filed late, (2) not being filed at all, or (3) being filed without properly identifying the known or suspected wrongdoer as the subject.

142. By reason of the foregoing, the Government is entitled to entry of a judgment against Haider in the amount it is seeking, $1 million.

143. By reason of the forgoing, and pursuant to 31 U.S.C. § 5320, the Government is also entitled to an order enjoining Haider from participating, directly or indirectly, in the conduct of the affairs of any financial institution that is located in the United States or conducts business within the United States, for a term of years sufficient to prevent future harm to the public.

WHEREFORE, the Government respectfully requests that judgment be entered in its favor and against Defendant, and that the Court:

    a. Issue an order reducing FinCEN's assessment against Haider to judgment, and awarding the Government judgment in the amount of $1 million;

    b. Issue an order enjoining Haider from participating, directly or indirectly, in the conduct of the affairs of any "financial institution" (as that term is used in the BSA and its implementing regulations) that is located in the United States or conducts business

within the United States, for a term of years — to be determined at trial — sufficient to prevent future harm to the public; and

    c.    Award such other and further relief as the Court deems just and proper.

Dated:    New York, New York
December 18, 2014

PREET BHARARA
United States Attorney for the
Southern District of New York
Attorney for the United States

BY: _____
CHRISTOPHER B. HARWOOD
Assistant United States Attorney
86 Chambers Street, Third Floor
New York, New York 10007
Telephone: (212) 637-2728
Facsimile: (212) 637-2786
Email: christopher.harwood@usdoj.gov